

# United States District Court, Northern District of Illinois

| Name of Assigned Judge or Magistrate Judge | James B. Moran | Sitting Judge if Other than Assigned Judge | |
|---|---|---|---|
| **CASE NUMBER** | 99 C 7726 | **DATE** | 2/5/2001 |
| **CASE TITLE** | Gerald Sprague vs. Central States, etc. et al. | | |

[In the following box (a) indicate the party filing the motion, e.g., plaintiff, defendant, 3rd party plaintiff, and (b) state briefly the nature of the motion being presented.]

**MOTION:**

Memorandum Opinion and Order

**DOCKET ENTRY:**

(1) ☐ Filed motion of [ use listing in "Motion" box above.]
(2) ☐ Brief in support of motion due _____.
(3) ☐ Answer brief to motion due_____. Reply to answer brief due_____.
(4) ☐ Ruling/Hearing on _____ set for _____ at _____.
(5) ☐ Status hearing[held/continued to] [set for/re-set for] on _____ set for _____ at _____.
(6) ☐ Pretrial conference[held/continued to] [set for/re-set for] on _____ set for _____ at _____.
(7) ☐ Trial[set for/re-set for] on _____ at _____.
(8) ☐ [Bench/Jury trial] [Hearing] held/continued to _____ at _____.
(9) ☐ This case is dismissed [with/without] prejudice and without costs[by/agreement/pursuant to]
    ☐ FRCP4(m)   ☐ General Rule 21   ☐ FRCP41(a)(1)   ☐ FRCP41(a)(2).
(10) ■ [Other docket entry] Enter Memorandum Opinion and Order. We grant the summary judgment motions of Central States and UPS and therefore dismiss plaintiff's motion to amend as moot.
(11) ■ [For further detail see order attached to the original minute order.]

| | | | |
|---|---|---|---|
| | No notices required, advised in open court. | | **Document Number** |
| | No notices required. | number of notices | |
| | Notices mailed by judge's staff. | FEB 07 2001 | |
| | Notified counsel by telephone. | date docketed | |
| ✓ | Docketing to mail notices. | | 53 |
| ✓ | Mail AO 450 form. | docketing deputy initials | |
| | Copy to judge/magistrate judge. | | |
| WAH | courtroom deputy's initials | 01 FEB -6 PM 3: 29 | date mailed notice |
| | | Date/time received in central Clerk's Office | mailing deputy initials |

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | | |
|---|---|---|
| GERALD SPRAGUE, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| vs. | ) | No. 99 C 7726 |
| | ) | |
| CENTRAL STATES, SOUTHEAST | ) | |
| AND SOUTHWEST AREAS PENSION | ) | |
| FUND, etc., et al., | ) | |
| | ) | DOCKETED |
| Defendants. | ) | FEB 0 7 2001 |

## MEMORANDUM OPINION AND ORDER

Plaintiff Gerald Sprague brings this action against Central States, Southeast and Southwest Areas Pension Fund (the Fund), the Fund's trustees (trustees), and United Parcel Service (UPS), alleging violations of the Employee Retirement Income Security Act (ERISA), 29 U.S.C. § 1001 *et seq*. The dispute arises from an arrangement by which the Fund and its trustees (collectively "Central States") agreed not to collect approximately $100 million in pension contributions allegedly owed by UPS during the period August 1, 1997, through December 1, 1997. Plaintiff believes the arrangement was unlawful. He alleges that by entering into the deal Central States breached its ERISA fiduciary duties, 29 U.S.C. § 1104(a)(1)(D), and that both Central States and UPS engaged in a prohibited transaction, 29 U.S.C. § 1106(a)(1)(B), (D). Defendants riposte that there was no obligation to pay or collect contributions for the period in question and therefore no violation of ERISA.

There are three motions presently pending: Central States' motion for summary judgment, UPS' motion to dismiss or for summary judgment, and plaintiff's motion to amend

the complaint to name the trustees as defendants in their individual capacity. For the reasons set forth below, we grant the summary judgment motions of Central States and UPS and therefore dismiss plaintiff's motion to amend as moot.

## BACKGROUND

The Fund is a multi-employer pension plan existing under the auspices of a trust agreement between the trustees, various employers (including UPS), and local unions affiliated with the International Brotherhood of Teamsters (IBT) (Kubalanza aff. exh. A). UPS has been the single largest employer member of the Fund for some time. By 1997, UPS employees comprised 18 per cent of the Fund's active participants and accounted for 22 per cent of the Fund's annual contributions. UPS' contribution levels into the Fund are set by the terms of its collective bargaining agreement with IBT and regional supplements thereto. Perhaps weary of carrying a disproportionate burden, UPS sought to alter its position with the Fund when it came time to renegotiate its relationship with IBT in 1997. The collective bargaining agreement existing at that time was set to expire on July 31, 1997. In May 1997, UPS informed IBT and the trustees that it was considering withdrawing from the Fund altogether and establishing a separate pension plan for UPS employees (Murray aff. exh. A). Concerned, the trustees commissioned an actuarial study to assess the impact of UPS' withdrawal on the financial well-being of the Fund. The actuaries returned with some grim forecasts. Their report to the trustees of June 9, 1997, stated that a withdrawal by UPS would harm the actuarial health of the Fund (Kubalanza aff. exh. B). This news no doubt heightened the trustees' interest in the UPS/IBT collective bargaining agreement talks.

Negotiations between UPS and IBT continued through the spring and early summer

of 1997. David Murray (Murray) served as chief negotiator for UPS. Ken Hall (Hall) and IBT general president Ron Carey (Carey) co-chaired IBT's negotiating team. The negotiators were unable to reach an agreement by late July. Not surprisingly, the level of UPS' pension contributions under the new collective bargaining agreement emerged as a principal obstacle to an accord. UPS issued a last best offer dated July 22, 1997, but to no avail (Murray aff. exh. B). Hopeful still, the negotiators pressed on with the talks as the deadline neared, agreeing to extend the expiration date of the existing CBA to August 4. The few extra days failed to produce a deal, however, and the negotiations broke off. On August 4, 1997, IBT authorized a strike against UPS.[1]

The impasse lasted for several days. As the negotiators mulled their options and the workers walked the picket lines, the Fund's executive director, Ronald Kubalanza (Kubalanza), was developing a promising idea with trustee Ray Cash (Cash) and the actuaries. They came up with an abatement plan. The plan was a simple one: UPS would remain with the Fund and enter into a new five-year collective bargaining agreement with IBT at increased contribution rates, and in exchange UPS' contributions would be abated from August 1, 1997, through December 31, 1997. Central States refers to this abatement plan as a "back-loaded" or "structured rate" plan because it obligates UPS to pay increased contributions over the five-year life of the plan, but none for the first five months. On August 11, 1997, Kubalanza and Cash advised Carey of the abatement plan. Carey liked the idea, but decided not to make it an official IBT offer at that time.

---

[1] Once the strike began, UPS ceased its contributions to the Fund. The trust agreement provides in relevant part: "The obligation to make such contributions shall continue during periods when the collective bargaining agreement is being negotiated, but such contributions shall not be required in case of strike after contract terminations, unless the parties mutually agree otherwise."(Kubalanza aff. exh. A. at Art. III., § 1).

Meanwhile, the dispute between UPS and IBT was turning into a national crisis. President Clinton dispatched Labor Secretary Alexis Herman to the scene, and at her urging the parties returned to the negotiating table on August 14, 1997. Two days passed without a deal. Finally, on August 16, IBT proposed the abatement plan to UPS, and end-game was at hand. Murray immediately seized on the plan and expressed his desire to speak directly with Kubalanza. Carey informed Kubalanza of the positive development and advised him to obtain the approval of the trustees before contacting Murray. Kubalanza telephoned the trustees on August 17 and was able to get majority approval. He then called Murray to discuss the abatement idea. The two quickly agreed on the substance of the plan but Murray insisted on something in writing. On the evening of August 18, Kubalanza faxed to Murray a letter confirming the agreement and describing the final terms of the abatement plan ("Kubalanza letter"). Paraphrasing, the Kubalanza letter contained the following terms: 1) UPS shall temporarily cease making contributions from August 1 through December 31, 1997; 2) the Fund shall grant service credit to UPS employees during this period; 3) the abatement will not constitute a withdrawal from the Fund; 4) UPS shall be deemed to have contributed during this period for the purposes of computing withdrawal liability; 5) UPS shall recommence contributing on January 1, 1998; and 6) the abatement plan is dependent on UPS entering into a new five-year collective bargaining agreement with IBT (Kubalanza aff. exh. D). A copy of the Kubalanza letter was also faxed to Hall (Hall aff. exh. A). Four hours later, UPS and IBT announced to the public that they had reached an agreement and that the strike was over.

On August 19, 1997, Kubalanza received the Summary of the Tentative National Master UPS Agreement for 1997-2002 ("tentative CBA") (Kubalanza aff. exh. E). The trustees

convened on August 25 and 26 to discuss the document. In that meeting the trustees approved the increased contribution rates set forth in the tentative CBA (Kubalanza aff. exh. B at 1, 20). The trustees also discussed the abatement plan in depth and unanimously approved the plan as necessary for the financial security of the Fund (Kubalanza aff. exh. B at 15-20). In a subsequent letter UPS and IBT memorialized the understanding that their collective bargaining agreement was contingent upon the abatement plan ("letter of agreement") (Hall aff. exh. B). The tentative CBA was subject to ratification, so the trustees also directed in their meeting that local unions representing UPS employees be informed of the terms of the tentative CBA (Kubalanza aff. exh. B at 19-20). Accordingly, the Fund distributed a newsletter dated August 1997, which described the basic nature of the tentative CBA and explained the reasons for the five-month abatement plan ("newsletter"). Attached to the newsletter was a bulletin ("bulletin") which contained specific figures regarding the increased UPS contribution levels and other features of the tentative CBA (Kubalanza aff. exh. F).

In early 1998, UPS employees ratified the National Master UPS Agreement for the Period August 1, 1997, through July 31, 2002 ("CBA") (Baxa aff. exh. A). As with predecessor agreements, the CBA was accompanied by various regional supplements, including the Teamsters Central Regional UPS Supplemental Agreement ("Central supplement") (Baxa aff. exh. B). Article 34 of the CBA states the amount by which UPS' contributions would be increased over the previous agreement. The Central supplement, like the previous regional supplement, is more detailed and specifies in Article 14 the weekly pension contribution levels required of UPS for each year of the five-year life of the agreement. Neither the CBA nor the Central supplement expressly provide that contributions would be abated for the first five

months of the agreement. Pursuant to the understanding between and among UPS, IBT and Central States, however, as reflected in the Kubalanza letter and the letter of agreement, no contributions were paid or collected for the period August 1 through December 31, 1997.

Plaintiff claims that contributions should have been paid and collected. His complaint boils down to three general claims. First, and chiefly, plaintiff alleges that the CBA, Central supplement, and other contract documents required weekly pension contributions from UPS at all times after August 1, 1997, and that Central States' failure to collect contributions amounted to a breach of its fiduciary duties under Section 404(a)(1)(D) of ERISA, 29 U.S.C. § 1104(a)(1)(D). Plaintiff also asserts, second, that Central States breached its fiduciary duties by granting service credits and retirement benefits during the period in question and, third, that Central States' failure to collect, and UPS' concomitant failure to pay, constituted a *per se* prohibited transaction in violation of Section 406(a)(1)(B) and (D) of ERISA, 29 U.S.C. § 1106(a)(1)(B), (D).[2] We disagree. A complete reading of the evidence in the record indicates that there was no obligation to contribute into the Fund for the period August 1, 1997, through December 31, 1997. Therefore, we agree with Central States and UPS.

## DISCUSSION

### I. Summary Judgment Standard

Pursuant to Rule 56 of the Federal Rules of Civil Procedure, summary judgment is appropriate "if the pleadings, depositions, answers to interrogatories, and admissions on file,

---

[2] In his original complaint, plaintiff requested an injunction directing trustees to sue UPS for the unpaid contributions under Section 515 of ERISA, 29 U.S.C. § 1145 (requiring that an employer shall make contributions to a pension plan in accordance with the applicable collective bargaining agreement). After he filed the original complaint, however, the Supreme Court issued its opinion in Harris Trust and Savings Bank v. Salomon Smith Barney Inc., 530 U.S. 238 (2000), which upheld a plan participant's ability under ERISA to maintain a direct action against a nonfiduciary party in interest. Plaintiff thereafter filed an amended complaint adding UPS to his prohibited transaction charge.

together with the affidavits, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(c); see Celotex Corp. v. Catrett, 477 U.S. 317, 322-23 (1986). In considering a motion for summary judgment a court must "construe all facts in the light most favorable to the non-moving party and draw all reasonable inferences in favor of that party." Skorup v. Modern Door Corp., 153 F.3d 512, 514 (7th Cir. 1998); see Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 247 (1986). A genuine issue of material fact exists if there is sufficient evidence for a reasonable factfinder to decide the issue in favor of the non-moving party on the particular issue. Eiland v. Trinity Hosp., 150 F.3d 747, 750 (7th Cir. 1998). The "mere existence of some alleged factual dispute between the parties," however, will not defeat summary judgment. Anderson, 477 U.S. at 247.

## II. Interpretation of the CBA Documents

At the outset, we should note that plaintiff does not challenge the prudence of the abatement plan in and of itself. Perhaps plaintiff concedes that Central States appropriately discharged any fiduciary duties it may have owed when it embraced the abatement arrangement as essential to the financial well-being of the Fund. Whatever his reasons, plaintiff does not contend that Central States committed a fiduciary error by adopting the abatement plan. Rather, plaintiff's principal claim rests on a contract theory. He argues that Central States was under a contractual obligation to collect pension contributions during the five-month period August 1, 1997, through December 31, 1997, and that it breached that obligation by failing to do so. Plaintiff locates the source of the contractual obligation within

the collective bargaining agreement.[3] Specifically, he argues that the CBA and the Central supplement require pension contributions to begin on August 1, 1997. Since Central States did not begin collecting contributions until January 1, 1998 (pursuant to the abatement arrangement), plaintiff reasons that it breached those two contract documents. This offense, plaintiff concludes, violated Section 404(a)(1)(D) of ERISA ("a fiduciary shall discharge his duties ... in accordance with the documents and instruments governing the plan."). 29 U.S.C. § 1104(a)(1)(D).

Our primary task in this dispute, therefore, is to determine what obligations arose under the CBA and related documents. Specifically, we must decide whether there was an obligation on the part of UPS to pay and on the part of Central States to collect pension contributions from August 1 through December 31, 1997. If so, then defendants may have acted contrary to the agreement and in violation of ERISA. If not, then Central States wins because there can be no breach of fiduciary duty. Thus, we face a question of contract interpretation. Summary judgment is particularly appropriate in such cases. <u>Murphy v. Keystone Steel & Wire Co.</u>, 61 F.3d 560, 564-65 (7th Cir. 1995).

"A collective bargaining agreement is not an ordinary contract for the purchase of goods and services, nor is it governed by the same old common-law concepts which control such private contracts." <u>Transportation-Communication Employees Union v. Union Pacific</u>

---

[3] Plaintiff alternatively argues that an obligation to contribute arose under the trust agreement and also under certain participation agreements between local IBT affiliates and UPS. A quick review of these documents, however, leads us back to the CBA. The trust agreement provides: "Each Employer shall remit continuing and prompt contributions to the Trust Fund as required by the applicable collective bargaining agreement ..." (Kubalanza aff. exh. A at Art.III, § 1). Likewise, the two participation agreements included in the record provide that UPS' obligation terminates if the applicable CBA no longer requires contributions and/or if UPS notifies the Fund that it is no longer under a duty to contribute (Duffey aff. exh. F). UPS provided notice by letter dated August 7, 1997 (Calvert aff. exh. A). The CBA and related documents remain the foundation of plaintiff's case.

Railroad Co., 385 U.S. 157, 160-61 (1966). When interpreting a CBA "it is necessary to consider the scope of other related collective bargaining agreements, as well as the practices, usage and customs pertaining to such agreement." *Id.* at 161. Furthermore, we are to read the agreement "with sensitivity to considerations of national labor policy" and construe it so as to "foster industrial peace and stability." Merk v. Jewel Food Stores, 945 F.2d 889, 892 (7th Cir. 1991), *cert. denied*, 504 U.S. 914 (1992). Central to this charge is the fundamental principle that related contract documents must be read together so as to give effect to all of their provisions and render them consistent with each other. Central States, Southeast and Southwest Areas Pension Fund v. Kroger Co., 73 F.3d 727, 731 (7th Cir. 1996); Murphy, 61 F.3d at 565. This means that we must engage in a holistic reading of the contract documents in order to determine what duties arose under the agreement at issue in this case.

Applying these principles, we find that the important contract documents are not just the CBA and the Central supplement, but also the Kubalanza letter and the letter of agreement. These contemporaneous documents embody the understanding between UPS, IBT and Central States, and must be read in light of each other. *See* Kroger, 73 F.3d at 731 (holding that CBA-related documents executed at the same time by the same parties are to be construed as one agreement). We introduced these materials above. Now it is time for some detail. Plaintiff's argument is built primarily around the CBA and the Central supplement. He claims that these contract documents obligated UPS to begin making pension contributions into the Fund on August 1, 1997. Article 34(a) of the CBA provides the following:

> Health & welfare and/or pension contributions shall be increased by twelve dollars ($12.00) per week on August 1, 1997; and fourteen dollars ($14.00) per week on August 1, 1998; and fourteen dollars ($14.00) per week on August 1, 1999; and sixteen dollars ($16.00) per week on August 1, 2000; and sixteen

dollars ($16.00) per week on August 1, 2001.

(Baxa aff. exh. A). Aware that the above language is permissive in that it does not necessarily require pension contributions to be increased on August 1, 1997 (*i.e.*, an increase of $12 in health and welfare contributions alone would satisfy the clause), plaintiff urges us to consider the Central supplement as well. Article 14 of that document states:

> Section 1 – Pension
> Effective on the dates listed below, the Employer shall contribute to [the Fund] the corresponding dollar amounts for each full-time seniority employee covered by this Agreement (except as may be modified by an approved Local Union Rider).

and consequently violated ERISA.

Plaintiff's theory may have carried some weight if the CBA and Central supplements were the only two documents at play. But they are not. The letter of agreement and Kubalanza letter are also integral parts of the contract and cannot be ignored. These two documents prove fatal to plaintiff's claim for they establish that the abatement plan was an essential term of the overall agreement. In relevant part, the Kubalanza letter of August 18, 1997, described the agreement between UPS and the Fund as follows:

> 1. [UPS] shall temporarily cease contributing to the Pension Fund during the period August 1, 1997 to and including December 31, 1997;
> 　　　　　　　　* * *
> 5. [UPS] shall recommence making contributions to the Pension Fund on January 1, 1998 pursuant to the terms of the new collective bargaining agreement;
> 6. The Pension Fund's agreement as set forth in this letter is dependent upon [UPS]'s continued participation in the Pension Fund for a period of five years pursuant to the terms of the new collective bargaining agreement; ....

(Kubalanza aff. exh. D). IBT and UPS affirmed and adopted the terms of this abatement plan in the letter of agreement.

(Hall aff. exh. B). The letter of agreement was signed by Hall for IBT on August 26 and by Murray for UPS on September 2.[4] When read together, as they must be, the Kubalanza letter and the letter of agreement, along with the CBA and Central supplement, tell a single story: UPS agreed to stay in the Fund and sign a five-year CBA with IBT at an increased contribution rate, and in exchange IBT and the Fund agreed to abate the first five months of contributions.

Plaintiff attempts to diffuse the impact of the Kubalanza letter and letter of agreement in a number of different ways. He argues that those two documents are in direct conflict with the CBA and Central supplement. We do not agree. Courts are to "seek an interpretation that reconciles" potentially-conflicting provisions of a collective bargaining agreement, even if "this may compel a rather forced construction." Diehl v. Twin Disc, Inc., 102 F.3d 301, 306 (7th Cir. 1996). Our reading of the agreement is hardly a forced one, especially when we place the contract documents in context. Recall that the parties were at an impasse until Central States and IBT floated the idea of the abatement plan to UPS. All of the players in the negotiations – Murray, Kubalanza, Hall, and Carey – agree that the abatement plan was a critical component of the deal (Kubalanza aff. at ¶ 19; Hall aff. at ¶ 8; Murray aff. at ¶ 8). A majority of the trustees approved the abatement proposal on August 18, and the entire board affirmed the plan unanimously in the meeting of August 26. IBT and UPS then included the terms of

---

[4]Plaintiff protests that the letter of agreement did not expressly incorporate the abatement plan into the CBA. The language of the letter of agreement is fairly straightforward and speaks for itself. Furthermore, a contract document need not be incorporated by reference in order to be considered part of the overall collective bargaining agreement. See Kroger, 73 F.3d at 731. Plaintiff is correct in that IBT and UPS could have included the abatement plan within the CBA in a more direct fashion. But they were not required to do more than they did. The contract documents are related, and we construe them together.

the plan into the CBA via the letter of agreement, expressly stating that their agreement was contingent on the abatement arrangement. Neither Central States nor UPS nor IBT have ever claimed that contributions should have been made between August 1 and December 31, 1997. *See* Union Pacific, 385 U.S. at 161 (holding that practice, usage and custom are important considerations when interpreting a collective bargaining agreement). UPS did not pay contributions during that period and Central States never asked it to do so. This sequence of events confirms that the abatement plan was part and parcel of, and not in conflict with, the collective bargaining agreement.

Plaintiff also makes a fairly contorted argument based on the effective dates of the various contract documents, arguing that since the CBA and the Central supplement were effective August 1, and the abatement plan was not effective until either the August 18 Kubalanza letter or the August 26 letter of agreement, the abatement plan contradicted the pre-existing terms of the CBA and the Central supplement. This theory belies reality. The facts establish that the CBA was reached following, and indeed as a result of, the abatement plan. The tentative CBA was circulated on August 26, 1997, and the CBA itself was not ratified until early 1998. That the CBA was made effective retroactive to August 1, 1997, does not alter the fact that there existed no obligation to contribute at the time of the Kubalanza letter and letter of agreement. *See* Central States Pension Fund v. Reebie Storage & Moving Co., Inc., 815 F.Supp. 1131, 1135 (N.D. Ill. 1993) ("... the date on which parties enter into an agreement establishes their rights and obligations.").

We are to interpret the terms of an ERISA-governed collective bargaining agreement "in an ordinary and popular sense, as would a person of average intelligence and experience."

Santaella v. Metropolitan Life Ins. Co., 123 F.3d 456, 461 (7th Cir. 1997) (internal quotation marks omitted). When we do so here, reading related contract documents together, we find that there was no obligation to pay or collect pension contributions for the period August 1, 1997, through December 31, 1997. Central States' actions were consistent with the terms of the applicable contract documents and therefore it did not breach its fiduciary duties under Section 404(a)(1)(D) of ERISA.

### III. Service Credits and Retirement Benefits

The bulk of plaintiff's complaint rests on the contract theory discussed above. He raises two other claims, but without much elaboration. Plaintiff faults Central States for granting service credits and retirement benefits to UPS employees from August 1 through December 31, 1997, even though UPS did not contribute into the Fund during that period. He refers us to the Fund's Restated Plan, which includes provisions like the following: "A Participant shall earn contributory service credit for any employment with a contributing employer required to make employer contributions on his behalf according to a collective bargaining agreement." (Cplt. at ¶ 23; Duffey aff. exh. C).[5] Plaintiff complains that the abatement arrangement enabled Central States to grant service credits and retirement benefits to UPS employees without collecting corresponding contributions from UPS, all in violation of the Restated Plan (and, presumably, Section 404(a)(1)(D)).

Initially, it is important to keep in mind that the purpose of the Restated Plan, like that of ERISA itself, is to ensure that the trustees at all times protect the financial health of the Fund. *See* Central States, Southeast and Southwest Areas Pension Fund v. Central Transport,

---

[5] Exhibit C of Duffey's affidavit contains selections of the Restated Plan, but the full document has not been included in the record on summary judgment.

Inc., 472 U.S. 559, 580-81 (1985). This is precisely why the trustees adopted the abatement plan in this case. All of the evidence indicates that UPS' threatened withdrawal put the financial security of the Fund at risk, and the abatement plan emerged as the Fund's salvation. (Kubalanza aff. at ¶¶ 7-13, 19; Hall aff. at ¶ 8; Murray aff. at ¶ 8). Furthermore, the trustees and actuaries structured the abatement plan so as to enable UPS employees to accrue service credits and retirement throughout the life of the CBA. *See* Pappas v. Buck Consultants, Inc., 923 F.2d 531, 538 (7th Cir. 1991) (fund administrators can rely on the advice of their actuaries). The abatement arrangement secured UPS' continued participation in the Fund for five additional years. Central States explains that while the first five months of UPS' contributions were abated, the remaining fifty-five months of contributions are to be amortized over the full five-year life of the CBA. Thus, while no contributions were owed during the abatement period, the credits and benefits given out during that period were supported by corresponding contributions from UPS (Angerame aff. at ¶¶ 5-7).[6]

We stress that this is not a case in which IBT and UPS entered into a scheme, unbeknownst to Central States, whereby they withheld contributions from the Fund. *See generally* Central States, Southeast and Southwest Areas Pension Fund v. Gerber Truck Service, Inc., 870 F.2d 1148 (7th Cir. 1989) (en banc). Quite differently, in this case Central States not only knew of the abatement arrangement at all times, it was the party that proposed

---

[6]Plaintiff does not submit an affidavit to compete with that of Central States' accountant, Mark F. Angerame. Instead, he refers us to a portion of Central States' 1997 financial statement and various internal accounting documents. He says that in these documents Central States listed contributions as owed by UPS but unpaid and/or written off (Duffey aff. exhs. H-J, O). No contributions were owed during August 1 through December 31, 1997. *See* part II, *supra*. Furthermore, the documents cited by plaintiff do not contradict the testimony of Angerame, as they make express reference to the abatement plan and explain that contributions receivable from UPS during the period in question are deferred for accounting purposes pursuant to the plan. (Duffey aff. exhs. I and O).

the plan in the first place. Indeed, the Kubalanza letter made clear from the start that "the Pension Fund shall grant contributory service credit for all purposes on behalf of all eligible employees of [UPS] who worked and were entitled under the new collective bargaining agreement to have pension contributions made on their behalf." (Kubalanza aff. exh. D). The evidence establishes that the abatement plan was a viable (and perhaps the only) means to preserve the financial standing of the Fund, and that UPS counter-balanced service credits and retirement benefits for the period in question with corresponding contributions over the five-year life of the CBA. Plaintiff simply does not present us with enough contrary evidence to withstand summary judgment on this claim.

IV. Prohibited Transaction

Finally, plaintiff alleges that both Central States and UPS engaged in a prohibited transaction contrary to Section 406(a)(1) of ERISA. In relevant part, that section provides that a fiduciary shall not knowingly cause the plan to engage in a transaction that constitutes a direct or indirect "(B) Lending of money or other extension of credit between the plan and a party in interest," or "(D) Transfer, to or use by or for the benefit of, a party in interest, of any assets of the plan." 29 U.S.C. § 1106(a)(1). Plaintiff argues that the abatement plan between Central States and UPS constitutes a *per se* prohibited transaction under this provision. *See* Prohibited Transaction Exemption 76-1, 41 Fed.Reg. 12740, 12741 (1976) ("if the plan is not making systematic, reasonable and diligent efforts to collect delinquent contributions, or the failure to collect is the result of an arrangement, agreement or understanding, express or implied, between the plan and the delinquent employer, such failure to collect may be deemed to be a prohibited transaction."). Prerequisite to plaintiff's Section 406 theory, however, are

owed or otherwise delinquent contributions. If there is no obligation to contribute in the first instance, then there can be no owed contributions and thus no Fund credit or asset to misappropriate. *See* Central Transport, 472 U.S. at 573 (Section 406 protects assets to which the plan "is entitled"); Liss v. Smith, 991 F.Supp. 278, 291 (S.D.N.Y. 1998); John Boettcher Sewer & Excavating Co., Ltd. v. Midwest Operating Engineers Welfare Fund, 803 F.Supp. 1420, 1422-25 (N.D. Ind. 1992). Thus, the Section 406(a)(1) claim that defendants mishandled contributions quickly returns us to the central issue of this case: whether there was an obligation to pay/collect pension contributions. We have determined that there was not, so the prohibited transaction claim fails.

## CONCLUSION

For the reasons set forth above, we grant the summary judgment motions of Central States and UPS and therefore dismiss plaintiff's motion to amend as moot.

JAMES B. MORAN
Senior Judge, U. S. District Court

Feb. 6, 2001.